IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARILYN MOFFAT, KAREN KEMMIS,
DANIELLE PARKER, and MARK RICHARDS,

                  Plaintiffs,                             OPINION & ORDER

    v.

                                                     15-cv-626-jdp

ACADEMY OF GERIATRIC PHYSICAL THERAPY,

                  Defendant.

---

The main issue in this case is the ownership of materials used in a program that certifies physical therapists as experts in geriatric exercise. This dispute was a foreseeable one that could have been avoided easily if the parties had fully worked out their agreements in writing when they undertook to develop the course. But they did not, and now disagreements over control of the course have given rise to a messy copyright case.

Defendant Academy of Geriatric Physical Therapy is a non-profit professional association of physical therapists who specialize in treating older adults. More than a decade ago, the Academy established a task force to promote physical therapists as experts in exercise for the aging. This effort led to the Academy's creation of the Certified Exercise Expert for Aging Adults (CEEAA) program, which requires participants to complete three two-day courses to achieve certification. Plaintiffs are highly credentialed physical therapists and members of the Academy. They each taught parts of the CEEAA course and played a role in its development. What matters most here is that they claim to have written the course materials, consisting of several PowerPoint slide decks and lab manuals. After a dispute over control of the course arose, plaintiffs applied for and received copyright registrations in the course materials in their own names.

The Academy now offers the CEEAA course without plaintiffs' participation, but it uses a version of the course materials that plaintiffs claim as theirs. So plaintiffs brought this suit alleging that the Academy infringes their copyrights. The Academy asserts counterclaims for breach of contract against all plaintiffs and for breach of fiduciary duty against plaintiff Danielle Parker, who had been a member of the Academy board of directors when plaintiffs registered copyright to the course materials.

Both sides move for summary judgment on plaintiffs' copyright infringement claims. Dkt. 29 and Dkt. 30. The material facts are not genuinely disputed, despite the unsupportable allegations in plaintiff Moffat's affidavits, which the court discredits as a matter of law. The court concludes that although plaintiffs were not formal employees of the Academy, the course materials were nevertheless prepared as works made for hire under the principles set out in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). The Academy at all times retained ownership of the course itself, had the right to control course content, paid two plaintiffs for course administration, and other Academy members contributed to the course materials. And the versions of the course materials plaintiffs now claim are derivative works based on earlier versions that the Academy owns.

Even if the course materials were not works made for hire, plaintiffs' infringement claims would fail for an additional reason: plaintiffs have, at a minimum, granted the Academy an implied, non-exclusive license to use plaintiffs' contributions in connection with the CEEAA course and certification program. Although this implied license would not allow the Academy to sue for infringement, it would defeat plaintiffs' copyright infringement claims.

Plaintiffs also move for summary judgment on the Academy's counterclaims. Dkt. 30. That part of plaintiffs' motion is also denied. Plaintiffs raise no argument as to the Academy's contract claims. Factual disputes preclude summary judgment on the breach of fiduciary duty claim against plaintiff Parker.

FACTS

Before laying out the facts, the court must deal with plaintiffs' failure to comply with the court's summary judgment procedures, which are provided in the preliminary pretrial conference order. Dkt. 9. The essential requirement is that the parties must set out proposed findings of fact that include "all facts necessary to sustain the motion for summary judgment." *Id.* at 9. These proposed facts, and any fact-based objections to the opposing side's proposed facts, must cite admissible evidence. These evidentiary requirements are important because only a *genuine* dispute of a material fact will preclude summary judgment, and a genuine dispute is one supported by admissible evidence. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897-98 (7th Cir. 2003).

The Academy's summary judgment submissions are meticulously prepared to comply with the court's requirements. But plaintiffs failed to comply in many ways, as the Academy points out. Dkt. 46, at 3-10 and Dkt. 54, at 4-9. Plaintiffs' submissions are replete with factual assertions and objections that are not grounded in evidence. *See* Dkt. 46, at 5-6 (listing 25 examples of statements in plaintiffs' summary judgment brief that are not supported by citations to proposed facts or evidence). Plaintiffs acknowledge that they were aware of the court's summary judgment procedures. But they contend that although they did not provide as much "citation support" as the Academy did, "virtually all of the individual

3

PFOFs were supported by citation to the evidence." Dkt. 56, at 4-5. But this is simply not true. Many of plaintiffs' responses to the Academy's proposed facts are not at all grounded in evidence. The problem is so pervasive that the court will deem the Academy's proposed facts undisputed.[1]

Plaintiffs' submissions pose a second problem. The primary source of plaintiffs' putative evidence is two affidavits from plaintiff Moffat, the first dated July 21, 2016, Dkt. 45, and the second filed August 18, 2016, Dkt. 52.[2] Moffat was deposed on May 23, 2016. Dkt. 25. Some of Moffat's affidavit statements contradict her deposition testimony, as well as the deposition testimony of the other plaintiffs.[3] It appears that Moffat's affidavit

---

[1] *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630-31 (7th Cir. 2010) (holding that the district court did not err when it deemed the defendant's proposed findings of fact admitted and refused to consider additional facts for the plaintiff's failure to follow the local procedures on proposed findings of fact); *Abraham v. Wash. Grp. Int'l, Inc.*, 766 F.3d 735, 737 (7th Cir. 2014) ("[T]his Circuit has routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions, including the precise local rule at issue here.").

[2] The second Moffat affidavit was filed on August 18, 2016, but the notarial certificate is dated August 21, 2016. Dkt. 52, at 11. The post-dating might raise questions about the validity of the affidavit, but the court will assume that the affidavit was made in good faith, and the date in the certificate is an error caused by attorney Sachs's use of the July 21, 2016 affidavit, Dkt. 45, as a template for the later affidavit. And further on the subject of plaintiffs' evidence, the Sachs declaration, Dkt. 59, does not comply with 28 U.S.C. § 1746 and contains statements that are not based on attorney Sachs's personal knowledge. But the points purportedly established by the Sachs declaration are not controversial, so the court will overlook those deficiencies.

[3] *Compare* Dkt. 52, ¶ 14 ("[T]he order and structure of the Copyrighted Materials was the result of my and my co-plaintiffs' judgment, expertise and experience. . . . There is no objective template that would dictate how the Copyrighted Materials would be structured . . . ."), *with* Dkt. 25 (Moffat Dep. 84:11-16) ("Q. Did you use any of the materials that had been created by the task force, such as the guidelines in the curriculum that we were discussing earlier? A. If you look at the laundry list, certainly, the laundry list contains topics that are in here; but it was a laundry list."), *and* Dkt. 26 (Richards Dep. 17:8-14.) ("[T]he creation of guidelines for exercise for aging adults . . . morphed into the development of the certification education program and then instruction of the certification courses."). *Compare*

statements, particularly those in her second affidavit, were made simply to controvert facts established by the Academy's motion for summary judgment. Moffat offers no explanation for why her affidavit testimony varies from her deposition testimony. The court will not disregard Moffat's affidavits entirely, but it will disregard any affidavit statement by Moffat that contradicts her deposition testimony under the sham affidavit rule. *See McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 750-51 (7th Cir. 2010). The court will also disregard any affidavit statement that is merely conclusory (such as that the Academy had "no 'control' whatsoever," or that it "repeatedly acknowledged" that plaintiffs owned the copyright to the course materials, Dkt. 52, ¶¶ 22, 36) or not based on her personal knowledge (such as "it was always the understanding of everyone concerned that we owned the Copyrighted Materials," Dkt. 45, ¶ 29).

What follows then is a summary of the core background facts as established by the parties' submissions. They are undisputed unless otherwise noted. Additional detail will be added in the analysis section where pertinent.

The Academy of Geriatric Physical Therapy is a non-profit professional association for physical therapists who specialize in geriatrics. The Academy is a section of the American Physical Therapy Association, and it was formerly known as the Section on Geriatrics of that

---

Dkt. 52, ¶ 21 ("It was in my and my co-plaintiffs' sole discretion as to what would be included and the format it would take."), *with* Dkt. 25 (Moffat Dep. 102:21-104:2; 107:2-11) ("I would bring the group together every time we could to go over all the articles that I would pull out. . . . And I would often get and sit with the group of them and pass around and say, 'Okay, yes or no, yes or no,' and they would check yes or no. . . . Whoever was faculty at that point in time would just sit around the table and go over the materials that I had brought. . . . I mean, this was 1,000-plus slides, and I actually did a good portion of the first 500 as well. So it was my material, for the most part, and those that had helped in the process."). *Compare* Dkt. 52, ¶ 11 ("*Only* the plaintiffs were involved in creating the Alabama Materials." (emphasis added)), *with* Dkt. 52, ¶ 25 ("The Alabama Materials were created *primarily* by myself and my co-plaintiffs . . . ." (emphasis added)).

5

association. The Academy is a 501(c)(3) charitable organization incorporated under the laws of the state of Virginia. Its headquarters are in Madison, Wisconsin, which accounts for the venue of this litigation. In addition to the typical functions of a professional association, the Academy provides training for therapists that can lead to certification as a Certified Exercise Expert for Aging Adults. The designation CEEAA is a federally registered trademark owned by the Academy.

Plaintiffs Marilyn Moffat, Karen Kemmis, Danielle Parker, and Mark Richards are physical therapists with advanced degrees and extensive experience. Plaintiffs have taught the Academy's courses that lead to CEEAA certification. They participated in the development of the courses, and Moffat especially played a key role. Moffat and Kemmis also served as course administrators. Parker was a member of the Academy's board of directors.

## A.      Development of the course materials and the dispute over ownership

In 2004, the Academy formed a task force to promote physical therapists as experts in geriatric exercise. The task force had about 10 physical therapist members, including plaintiffs Moffat, Kemmis, and Richards, and several Academy staff members. Moffat and Dale Avers (a non-party to this case) were co-chairs. The task force created educational and promotional materials, which included physical education curriculum content guidelines, instructions for physical therapists, and a PowerPoint presentation for continuing education for physical therapists, among other items. The task force did its work under the auspices of the Academy, and the task force reported and sought approval for its work and its proposals from the Academy. The Academy reimbursed expenses of the task force members, but no one was paid for their work.

As the task force was winding up its work, Avers proposed to the Academy that it establish a formal certification program. By the time the task force submitted its last report to the Academy in 2007, the task force had created a PowerPoint presentation of 500-600 slides for use as a continuing education program for physical therapists. The Academy established an "interim committee" to test and plan for the implementation of what would become the CEEAA program. Moffat and Kemmis chaired the interim committee.

To test the demand for such a program, the Academy offered several two-day "pre-courses" in 2007 and 2008. The pre-courses used the PowerPoint presentation created by the task force, which the court will refer to as the "Pre-course PowerPoint," and a set of tests and exercises, which the court will refer to as the "Pre-course Lab Manual." The court will refer to them together as the "Pre-course Materials." Plaintiffs contend that they did most of the work on the Pre-course Materials, but they now concede that the Academy owns the Pre-course PowerPoint and Pre-course Lab Manual. (Plaintiffs would later register the Pre-course Materials in their own names, and they asserted infringement of the Pre-course Materials in the complaint, although they have since dropped that claim.)

The interim committee proposed to implement the full CEEAA certification program; the Academy board of directors approved the program in 2008. The first CEEAA certification course was offered in Montgomery, Alabama, in March 2009. According to plaintiffs, the "Alabama Materials" used at this program were an interim version of the course materials: they were expanded versions of the Pre-course Materials, but not yet the fully expanded versions that plaintiffs would later register.

From 2009 to 2013, the CEEAA course was presented more than 18 times, and more than 850 physical therapists received CEEAA certification. Plaintiffs were among those who

taught the course and received the $1,000 per day honorarium (plus expenses) for doing so. Moffat and Kemmis were paid $4,000 per year to serve as course administrators; that amount was split between them. Dkt. 33-26, at 6.

The course materials were expanded and revised over this period, ultimately resulting in the six individually registered works that plaintiffs now allege are infringed. The court will refer to these six works as the 2013 Materials. They include: Part I Slides; Part I Lab Manual; Part II Slides; Part II Lab Manual; Part III Slides; and Part III Lab Manual. The 2013 Materials include approximately 2,000 slides and 283 lab manual pages. The 2013 slide collections present a paraphrase of published research on geriatric exercise, organized in a way that generally follows the outline of the Pre-course PowerPoint. The 2013 lab manuals collect assessments and exercises from third-party sources, again generally following the organizational scheme of the Pre-course Lab Manual.

The parties dispute exactly who did what on the 2013 Materials, but the material facts are not in genuine dispute. Plaintiffs and other Academy members met periodically, typically in connection with an Academy meeting, to review the CEEAA course materials. Moffat generally took primary responsibility, and plaintiffs did most of the work in expanding the Pre-course Materials into the 2013 Materials, but other CEEAA instructors contributed as well. The contributions of others were not as extensive as Moffat's, but the others made the same types of contribution that plaintiffs did. *See, e.g.*, Dkt. 58, ¶ 24.

Meanwhile, trouble was brewing. In July 2012, the Academy established another task force, this time to consider alternative models and structure for the CEEAA course. Moffat and Kemmis, the co-chairs of the CEEAA committee, were not appointed to the four-member task force, although plaintiff Parker was. In January 2013, the Academy board decided that it

would have the executive director ask for an electronic copy of the CEEAA course materials. Academy president William Staples made the request in June 2013. Moffat refused, asserting that she and Kemmis owned the copyright to the course materials. The Academy board contended that the course materials were mostly unprotectable, given that they consisted of factual matter largely drawn from third-party sources.

Later in 2013, the Academy attempted to negotiate new CEEAA administrator contracts with Moffat and Kemmis. The new contracts would expressly provide that the Academy owned the course materials; Moffat and Kemmis would not agree. In January 2014, the Academy informed Moffat and Kemmis that it would not renew their administrator contracts. In March 2014, plaintiffs applied for registration of the copyrights to the Pre-course Materials and the 2013 Materials.

When plaintiffs registered the course materials, plaintiff Parker was a member of the Academy's board of directors. Parker did not inform other board members about the filing. On November 7, 2014, Parker and the other plaintiffs filed a copyright infringement suit against the Academy in the United States District Court for the Southern District of New York. Dkt. 57, ¶ 1. Parker had been discussing her New York case with her attorney for "a few months" before filing the complaint. *Id.* ¶ 3. Parker resigned from the board two weeks later. Plaintiffs voluntarily discontinued their New York suit in September 2015 and then filed this action in this court in the same month.[4]

The Academy appointed a new interim CEEAA course administrator and continues to offer CEEAA courses using a modified version of the 2013 Materials.

---

[4] Plaintiffs now contend that they had no intent to litigate the suit in New York; that filing was "merely a 'placeholder,' intended to preserve venue in that court." Dkt. 56, at 30; *see also* Dkt. 59, ¶ 21.

**B.      Contracts between the parties**

Ownership of the course materials was not expressly locked in writing, but three sets of contracts are informative of the parties' intent on the issue.

The first set of contracts is the original instructor contracts, which each of the four plaintiffs entered when they taught CEEAA courses in 2009 and 2010. The contract is a form contract that the Academy used for Academy-sponsored programs generally; it was not drafted specifically for use with the CEEAA program. Using one of Moffat's contracts as an example, the pertinent parts of the contract provide:

> HANDOUTS
> Handouts must be received by the Section no later than October 21, 2009. Speakers agree to grant the Section on Geriatrics permission to sell course handouts outside of the course. This permission expires one year after the course is given. The Section on Geriatrics will not have sole copyright of the handouts or of the speaker's presentation. Should the speaker fail to provide handouts to the Section by the deadline, the Section has the right to reduce speaker honorarium after the course.
>
> * * *
>
> COPYRIGHT
> Speaker attests to the following: my presentation is my own original work, I have the authority to enter into this Agreement, and I am the sole copyright holder or that I have obtained all necessary permissions or licenses from any persons or organizations whose material is included or used in my presentation.

Dkt. 59-8, at 3, 6, 7. This was the form of the contract in effect for the Alabama Materials.

The handouts distributed to participants at the Alabama conference bore this legend:

> Handouts are property of the Section on Geriatrics. This material may not be reproduced, displayed, modified or distributed without the express prior written permission from the Section on Geriatrics. For permission, contact geriatricspt@apta.org.

10

Dkt. 49-3, at 4 and Dkt. 57, ¶ 7.

The second set of contracts is the revised instructor contracts, which were in place from 2011 through 2014. The revised instructor contracts were also form contracts, in that the name of the instructor and the specific date and place of the course were to be filled in. But this form was specifically prepared for use with CEEAA courses. Each of the plaintiffs, like all CEEAA instructors during this time, entered this form of instructor contract. The introduction to the revised instructor contract provides:

> The certification process and course title "Certified Exercise Experts for Aging Adults (CEEAA)" are the property of the Section on Geriatrics. The course series and course materials will not be used in their entirety without the expressed permission of the SOG.

Dkt. 33-26, at 10; Dkt. 33-37, at 4; Dkt. 33-38, at 4. The contract articulated the course instructor duties, which, among other things, required instructors to contribute to the course content:

> COURSE INSTRUCTOR DUTIES
>
> - Participate in conference calls and, as able, arranged meetings at [Combined Section Meeting] related to the ongoing content management of the CEEAA course.
>
>   * * *
>
> - Provide input related to course content.

*Id*.

The third set of contracts is the course administrator contracts that Moffat and Kemmis entered.[5] Moffat's 2013 administrator contract provides that the administrator is

---

[5] The parties have not provided Kemmis's 2013 administrator contract, although they agree that she was a co-administrator of the course in 2013. Dkt. 55, ¶¶ 72, 77, 114-16, 139.

responsible for, and compensated for, maintaining the course content. The pertinent provisions are:

> The certification process and course title "Certified Exercise Experts for Aging Adults (CEEAA)" are the property of the Section on Geriatrics. The course series and course materials will not be used in their entirety without the expressed permission of the SOG.

> * * *

> Content and administration of the CEEAA course is maintained on behalf of the SOG by the course Administrators of the course. The Administrators of the course receive the following:

> - An honorarium of $4000 per year for maintenance of course content and completion of the duties listed hereafter.

> * * *

> DUTIES OF THE COURSE ADMINISTRATOR(S)

> - Maintain the content of the CEEAA course series to reflect current literature with appropriate citations and acknowledgements.

> - Provide a complete, digital/electronic master copy of the entire course series (all three courses) with includes pictures, graphics, animations, multimedia links, etc. to the Section office for emergency purposes. Each new iteration of the course must be forwarded to the Section office within two weeks of completion of any updates. The section will provide data storage hardware and postage as often as needed for this purpose.

> - Insure that all handouts and course materials are reflective of the most current version of the course series.

Dkt. 33-26, at 7.

Plaintiffs received significant compensation for their work on the CEEAA course. Moffat received at least $89,210 in compensation from the Academy since 2007. Dkt. 55,

¶ 80. Kemmis received at least $86,235 since 2007. *Id.* ¶ 81. Parker received at least $58,500

since 2010, *id.* ¶ 82, and Richards, at least $26,000 since 2009, *id.* ¶ 83.

## ANALYSIS

### A.   Summary judgment standards

The familiar summary judgment standards apply. A court must grant summary

judgment when no genuine issue of material fact exists and the moving party is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-

23 (1986). When the parties cross-move for summary judgment, as they do here, the court

must consider their motions separately, and for each motion, "constru[e] all facts and draw[]

all reasonable inferences in favor of the non-moving party." *Black Earth Meat Mkt., LLC v.*

*Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). For each motion, the court "look[s] to

the burden of proof that each party would bear on an issue of trial" and "require[s] that party

to go beyond the pleadings and affirmatively to establish a genuine issue of material fact."

*Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citation omitted).

### B.   Plaintiffs' copyright infringement claims

To prevail on a copyright infringement claim, a plaintiff must show "(1) ownership of

a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*

*Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Plaintiffs contend that this

case is exceedingly simple: their copyright registrations for the 2013 Materials demonstrate

both the ownership and validity of their copyrights, and the Academy does not dispute

copying the registered materials.

13

But the registration certificates are not decisive on either ownership or validity. A certificate of copyright registration is "prima facie evidence" of the copyright's validity and of the "facts stated in the certificate." 17 U.S.C. § 410(c); *accord Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994). This merely creates a rebuttable presumption; a defendant accused of infringement can successfully defend the charge by showing that the copyright is invalid or that the facts stated in the certificate are untrue. *See Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). As the Seventh Circuit has explained, "the burden of proof in the sense of the risk of nonpersuasion . . . remains throughout the trial upon the party on whom it was originally cast." *Id. (*citation omitted). That burden is plaintiffs' here. The Academy also raises a few affirmative defenses. But for the purposes of this opinion, the only relevant one is the license defense, for which the Academy has the burden of proof. Fed. R. Civ. P. 8(c)(1); *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 761 (7th Cir. 2016).

Two more preliminary matters require attention: (1) the scope of plaintiffs' copyright infringement claims; and (2) the Academy's argument that the copyrightable aspects of the 2013 Materials are so meager that the 2013 Materials are not copyrightable. As for the first point, plaintiffs have narrowed the scope of their claims since the start of this case. Plaintiffs applied, and received, copyright registrations for eight works, including both the Pre-course Materials and 2013 Materials. They asserted claims of infringement of these eight works in their complaint, Dkt. 1, ¶¶ 26-34, and they moved for summary judgment on "all their causes of action," Dkt. 30, at 1. But plaintiffs' summary judgment brief concerns only the six works that comprise the 2013 Materials. In response, the Academy contends that plaintiffs concede that the Pre-course materials were created by the initial task force and that they are owned by

14

the Academy. Plaintiffs do not contest the point. In their opposition to the Academy's summary judgment motion, they assert ownership only in the 2013 Materials, so they are apparently willing to concede that the Pre-course Materials were created as works made for hire, which would make the Academy the owner and author of those materials. Dkt. 50, at 3. Plaintiffs have waived any argument to the contrary, *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 609 (7th Cir. 2008), and the court will deem the point conceded.[6] The Academy is thus the legal author and owner of the copyright to the Pre-course Materials,[7] and plaintiffs now claim copyright only in the 2013 Materials.

Plaintiffs' copyright infringement claims are further limited by the fact that the 2013 Materials are derivative works of the Pre-course Materials. As plaintiffs acknowledge, the 2013 Materials are expanded versions of the Pre-course Materials, which makes the 2013

---

[6] Even if the argument were not waived, the record shows that the course materials grew out of the work of the task force. The task force proposed course contents in their reports, and after the Academy's board approved them, the parties referred to them as guidelines and course curriculum. Plaintiffs then used the guidelines and course curriculum from the Academy's board as groundwork for the 2013 Materials. *See, e.g.*, Dkt. 33-16 (task force report dated August 30, 2014); Dkt. 33-17 (task force report dated January 11, 2007); Dkt. 33-18 (task force report dated June 5, 2006); Dkt. 25 (Moffat Dep. 84:11-16) ("Q. Did you use any of the materials that had been created by the task force, such as the guidelines in the curriculum that we were discussing earlier? A. If you look at the laundry list, certainly, the laundry list contains topics that are in here; but it was a laundry list."); Dkt. 26 (Richards Dep. 17:8-14.) ("[T]he creation of guidelines for exercise for aging adults . . . morphed into the development of the certification education program and then instruction of the certification courses.").

[7] Plaintiffs' copyright registrations of the Pre-course Materials are also invalid if they willfully misstated the authorship of those works. *See Foamation, Inc. v. Wedeward Enters., Inc.*, 947 F. Supp. 1287, 1296 (E.D. Wis. 1996) ("Not surprisingly, willfully failing to state a fact, (or willfully misstating a fact), which may have caused the copyright office to reject the application is grounds for invalidating the registration." (citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 7.20)). That appears to be the case here. Plaintiffs concede that the task force created the Pre-course Materials, but did not list the task members as the authors. *See, e.g.*, Dkt. 33-2, at 1, 4.

Materials derivative works. Any copyright plaintiffs might have in the 2013 Materials would be limited to the new features that plaintiffs added to the Pre-course Materials. *See Pickett v. Prince*, 207 F.3d 402, 405 (7th Cir. 2000) ("[T]he copyright is limited to the features that the derivative work adds to the original."). And as purported owner of derivative works, plaintiffs can claim copyright in the 2013 Materials only to the extent permitted by the parties' contracts. *See Liu v. Price Waterhouse LLP*, 302 F.3d 749, 755 (7th Cir. 2002) (holding that the owner of copyright in the original work retained exclusive right to the derivative works by contracts, even though the contracts were ambiguous, when the parties intended the owner of the original to retain the copyright in the derivative work).

The Academy contends that the copyrightable aspects of the 2013 Materials are so meager that the 2013 Materials are not copyrightable. The Academy has a point, but stretches it too far. Facts and ideas are not themselves copyrightable, so it would be fair to say that highly factual works, such as the materials at issue in this case, have relatively "thin" copyright protection. But compilations of factual material constitute copyrightable authorship, so long as the selection and organization of the facts demonstrate the requisite minimum of creativity. *Feist*, 499 U.S. at 344-45. The basic organizational scheme of the 2013 Materials is drawn from the Pre-course Materials, and thus plaintiffs cannot claim that organization as their authorship. But that still leaves the selection of materials used in the 2013 Materials, which represent a substantial expansion of the Pre-course Materials. Because that selection reflects judgment, it constitutes authorship that warrants copyright protection. That protection may be thin, as the Academy contends, but even thin protection would prohibit literal copying of the 2013 Materials, which the evidence suggests was the Academy's starting point for the version of the CEEAA materials it now uses.

16

The court concludes that the 2013 Materials are copyrightable works of authorship; the question is whether plaintiffs own them.

### 1.  Works made for hire

The Academy contends that it is the legal author and owner of all the CEEAA course materials because those materials were works made for hire under the Copyright Act. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."). A work made for hire is created in one of two ways. First, any work "prepared by an employee within the scope of his or her employment" is a work made for hire. 17 U.S.C. § 101(1). Second, an independent contractor can create a work made for hire, if "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire[,]" and the work is one of the types specified in the statute. 17 U.S.C. § 101(2). The parties agree that the second category does not apply: although the works at issue are "instructional texts," and thus candidates for work-for-hire treatment, plaintiffs and the Academy did not expressly agree in writing that the 2013 Materials would be works made for hire.

Thus, the question is whether plaintiffs created the 2013 Materials as the Academy's employees. The fact that plaintiffs were not formal employees of the Academy is not decisive. *Reid*, 490 U.S. at 733 n.8. Whether a person is an employee for purposes of § 101(1) of the Copyright Act is decided under common law principles of agency. *Id.* at 751. The Supreme Court endorsed the approach set out in Restatement (Second) of Agency § 220 (1958),

17

which sets out a non-exclusive list of ten factors to determine whether a person acts as an employee or an independent contractor. The factors cited by the Supreme Court are:

> The hiring party's right to control the manner and means by which the product is accomplished. . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Reid*, 490 U.S. at 751-52 (citations omitted). This guidance is flexible: the list of factors is not exhaustive, no factor is dispositive, and not all factors are relevant in every case. *See Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).

The court will consider the pertinent factors in groups for ease of exposition.

### a.  Employment status, payment, and length of relationship

Plaintiffs are skilled professionals who were not formal employees of the Academy: they did not receive traditional employee benefits, and neither employment taxes nor income taxes were withheld from their payments. So these are considerations that count in plaintiffs' favor, but this is just the beginning of the analysis.

There is no dispute that plaintiffs received substantial payment for their work in connection with the CEEAA course. Most of that came from the $1,000 per day honorarium that plaintiffs received for teaching the course; Moffat and Kemmis also received $4,000 per year as course administrators. Plaintiffs contend, however, that they received no payment at all specifically for their work on the course materials. Plaintiffs' contention is belied by the contracts they signed. Even as instructors their contractual duties included contributing to

18

updates of the course materials. Indeed, the instructor contracts placed particular emphasis on the importance of the handouts and linked the preparation of the handouts to the payment. Dkt. 52-4 ("Should the speaker fail to provide handouts to the Section by the deadline, the Section has the right to reduce speaker honorarium after the course. . . . Failure of the Speaker to provide services will result in cancellation of the honorarium."). And as course administrators, Moffat and Kemmis were paid to "[m]aintain the content of the CEEAA course series to reflect current literature with appropriate citations and acknowledgements." Dkt. 33-26, at 7. Work on the course materials was thus one of Moffat and Kemmis' main duties as course administrators and a main reason they were paid the administrator's fee.

The real question under the Restatement approach is not whether the agent was paid, but how. Payment by the hour implies employee status; payment by the job suggest independent contractor status. *See Reid*, 490 U.S. at 753; *Holt v. Winpisinger*, 811 F.2d 1532, 1540 (D.C. Cir. 1987); Restatement § 220(2) cmt. j. Here, plaintiffs were not engaged, like the independent contractor artist in *Reid*, to create a single independent work. Rather, plaintiffs had, at a minimum, a four-year relationship with the Academy, during which they contributed to the on-going development of the materials used for the CEEAA course. The long-term relationship between plaintiffs and the Academy suggests an employment relationship, counterbalancing the absence of a traditional, formal employment relationship.

### b.  Right to control

The right to control, and the exercise of control, are important factors under the Restatement approach. But control is a subtle concept, because the nature of control depends on the duties assigned. High-level employees, such as the "ship captains and managers of

great corporations," have broad discretion and significant independence, so the employer does not control the fine details of their performance. Restatement § 220(1) cmt. a. Those who create works of authorship are often engaged precisely because they have the creativity and skill that the employer lacks. Thus even writers and artists who are unquestionably employees nevertheless exercise significant discretion, with the employer's control exercised in other ways, such as through the articulation of standards to be met and through approval of the final product.

So it is here. Plaintiffs had initial discretion about what to include in the course materials. But the Academy retained and exercised the right to control the course materials in numerous ways. First, the Academy set the objectives and overall structures of the course. *See, e.g.*, Dkt. 33-16; Dkt. 33-17; Dkt. 33-18. Second, the Academy supervised, monitored, and funded the development of the course materials. *See* Dkt. 55, ¶¶ 30-33, 48-57, 109 and Dkt. 24 (Kemmis Dep. 77:1-17). Third, the Academy appointed and removed members of the task force, course instructors, and course administrators. *See, e.g.*, Dkt. 55, ¶¶ 19, 77, 119 and Dkt. 25 (Moffat Dep. 101:4-5).

Plaintiffs contend that the task force that developed the Pre-course Materials was disbanded after 2009, and thus the Academy ceded control to plaintiffs after that. Indeed, Moffat goes so far as to say that the Academy "had no 'control' whatsoever over the work [her] co-plaintiffs and [she] did for years in creating" the 2013 Materials. Dkt. 52, ¶ 22. But Moffat's conclusory assertion contradicts her own deposition testimony and the rest of the record.[8] The Academy continued to have control over the course contents even after 2009.

---

[8] Moffat's deposition testimony shows that the process of deciding what contents to include in the 2013 Materials and how to present them took into account other instructors' opinions—not just those of four plaintiffs. *See* Dkt. 25 (Moffat Dep. 102:21-104:2; 107:2-

For example, the Academy continued to have the authority to appoint or remove the course instructors and administrators. *See* Dkt. 55, ¶¶ 77, 119. The Academy obviously exercised that authority to remove Moffat and Kemmis from their administrator positions when they refused to turn over the course materials. Dkt. 25 (Moffat Dep. 101:4-5). Further, discussion about the administration of the course appears in the meeting minutes of every Academy board meeting from 2004 through 2014. Dkt. 55, ¶ 59. And finally, the Academy's ultimate control is confirmed in the 2013 administrator contract, which provides that the course content "is maintained on behalf of [the Academy] by the course Administrators of the course." Dkt. 33-26, at 7. Thus, the Academy might have exercised its right to control more frequently and more directly before 2009, but it continued to have that right even after 2009 when the 2013 Materials were created. *See Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 467 (S.D.N.Y. 2002).

The Academy's ongoing control and supervision of the CEEAA program, including the course materials, implies employee status for those who contributed to the course.

### c.  Regular business of the hiring party

The Academy is a non-profit professional association, but it is also in the business of providing educational services to its members. Other than membership dues, the CEEAA certification program is the largest source of revenue for the Academy. Dkt. 55, ¶ 89. Thus,

---

11). Testimony from other members of the Academy also confirms that those other than the four plaintiffs exercised some discretion in deciding the course contents. *See* Dkt. 23 (Heitzman Dep. 98:2-14) ("During our annual faculty meetings at CSM, we would discuss how to make them better, how to improve them, how to change them. . . . And during the meeting -- during the courses when you were giving them, you would have kind of a brainstorm at the end on what went good, what went bad, what do we improve."); Dkt. 27 (Staples Dep. 38:12-39:15) ("So, for instance, in Chicago, we sat in a big circle and reviewed articles and typed up description of that to add as possible slides for future presentations.").

the preparation and maintenance of the CEEAA course materials is part of the regular business of the Academy. This factor counts in the Academy's favor.

### d.  Right to assign additional projects

This is a minor factor. Plaintiffs apparently concede that the Academy "could, conceivably, 'assign' additional work to the plaintiffs, but it was up to them to undertake it." Dkt. 50, at 15-16. The administrator contract allowed the Academy to add certain specified duties. Dkt. 33-26, at 8 (listing the items that the "[a]dditional responsibilities may include"). The Academy board could, and from time to time did, revise the obligations of the instructors and course administrators. Even if plaintiffs could decline any additional duties and terminate their involvement in the CEEAA course, this arrangement is typical of employment. Thus, although this factor is often a relevant one, *Aymes*, 980 F.2d at 861, it does not tip significantly either way in this case.

### e.  Location of the work and the source of instrumentalities and tools

A prototypical example of employment under the Restatement approach is factory work: the work performed at the employer's factory using the employer's manufacturing equipment. *See* Restatement § 220(2) cmt. l. This case is not the prototypical example, because no major "instrumentalities" were required to prepare the course materials. And plaintiffs were not like the independent contractor in *Reid*, who worked in his own studio to construct a sculpture. 490 U.S. at 752.

Plaintiffs presumably used their own computers, but that would be the equivalent of the smaller implements that an employee coal miner might have to provide. *See* Restatement § 220(2) cmt. l illus. 9. Much of plaintiffs' work—reviewing journal articles for material that might be incorporated into the course materials—would have been performed on their own

time in a location of their choosing. But the meetings at which collaborative work on the course materials occurred were typically held at the facilities provided by the Academy. *See, e.g.*, Dkt. 55, ¶¶ 24, 84.

Thus, these factors tip, if at all, only slightly in plaintiffs' favor.

### f.   Other factors and conclusion

Employee status under the Restatement is not amenable to fixed definition, which is one reason why the listed factors are not the exclusive considerations. In this case, the broader context of the Academy's CEEAA program is important.

All agree that the CEEAA program belongs to the Academy. By virtue of its federal trademark registration, it holds the nationwide exclusive rights to the CEEAA mark, and the Academy alone can grant CEEAA certification to a physical therapist. The CEEAA course is run exclusively under the authority of the Academy and for the benefit of members of the Academy. It follows that the Academy owns the CEEAA course, which plaintiffs do not dispute.[9]

But plaintiffs contend that there is a distinction between the course and the course materials. Moffat argues that the course materials are like any textbook used in a university course, and neither the professor nor the university would own copyright to a textbook merely because it is used in a course. Dkt. 45, ¶ 30 and Dkt. 52, ¶ 13. But this analogy is

---

[9] Dkt. 52, ¶ 12 ("Plaintiffs do not contest that [the Academy] 'owns' the course title . . . ."); Dkt. 26 (Richards Dep. 42:25-43:1) ("A. Who owns the course? Yeah. That would be the Academy."); Dkt. 24 (Kemmis Dep. 151:16-18) ("[I]t was already identified, I believe, in these first contracts that the Section would own the course title and process."); Dkt. 33-26, at 10 ("The certification process and course title 'Certified Exercise Experts for Aging Adults (CEEAA)' are the property of the Section on Geriatrics."); *id.* at 7 ("Content and administration of the CEEAA course is maintained on behalf of the SOG by the course Administrators of the course.").

inapt, because unlike a typical textbook, which would be used in many courses at different schools, the CEEAA course materials were commissioned by the Academy specifically for use in the CEEAA course and the related certification program. *See* Dkt. 49-3, at 4. In the context of the CEEAA program, the distinction between ownership of the course and ownership of the course materials is specious.

Two more considerations tip in favor of the Academy. First, the course materials are not exclusively plaintiffs' work, and plaintiffs used and built upon the materials that others provided to them. The development of the course materials began with the work of the original Academy task force, and they are thus the product of many Academy members' work, not just the work of plaintiffs. For reasons already explained, the 2013 Materials are derivative works based on the Pre-course Materials, now conceded to be works owned by the Academy. And other Academy members contributed their own materials, which were building blocks of the 2013 Materials. To put it in terms of the Restatement analysis, the Pre-course Materials and other materials contributed by other Academy members were instrumentalities supplied by the Academy, which plaintiffs used to perform their work. *See* Restatement § 220(2) cmt. k. The fact that plaintiffs used the materials provided by the Academy and other members of the Academy tips strongly in favor of regarding plaintiffs as Academy's employees for purposes of their work on the course materials.

A second significant consideration is the treatment of the course materials in the parties' contracts and other documents pertaining to the course materials. Again, to be clear, these contracts do not expressly provide that the works are created as works made for hire. But expressions that the Academy would own or otherwise have rights to the course materials appear throughout. Dkt. 33-26, at 10; Dkt. 33-37, at 4; Dkt. 33-38, at 4; Dkt. 33-26, at 7.

The court will give less weight to the original instructor contracts from 2009 and 2010 because they were form contracts not specifically designed for the CEEAA course. And even if the court were to give those contracts some weight, plaintiffs plainly presented the course materials as the Academy's property even back in 2009. The legend printed on the handouts at the Alabama conference—the first full CEEAA course—state that the handouts are the property of the Academy (then known as the Section on Geriatrics). Dkt. 49-3, at 4 ("Handouts are property of the Section on Geriatrics. This material may not be reproduced, displayed, modified or distributed without the express prior written permission from the Section on Geriatrics."). It is hard to see how anyone could come away from the Alabama conference thinking that the *course instructors* would own the exclusive rights to the course materials.[10] The clearest expression of ownership is in the 2013 administrator contract, which was in place when the 2013 Materials were created. That contract expressly provides that the course administrators were to maintain the course materials on behalf of the Academy; that the course administrators were to update the course materials to reflect current research; and that the course administrators were to provided up-to-date electronic versions of the course materials to the Academy. Dkt. 33-26, at 7. (This last was an obligation that plaintiff Moffat refused to honor.)

Plaintiffs, particularly Moffat, put a lot of work into the 2013 Materials. But plaintiffs were not contracted by the Academy to produce a separate, free-standing work. They instead were called to contribute, with many others, to a long-term collective enterprise. All those

---

[10] This also demonstrates plaintiffs' intent to relinquish any copyright interest they might have had in the course materials. *See Seshadri v. Kasraian*, 130 F.3d 798, 805 (7th Cir. 1997) ("Had Seshadri authorized Kasraian or the *Journal of Applied Physics* to publish the article under Kasraian's sole name, that would be abandonment.").

who contributed to the Academy's CEEAA program, plaintiffs included, did so knowing that the Academy owned and ultimately controlled the CEEAA program. *See, e.g.*, Dkt. 55, ¶¶ 41, 109, 137; Dkt. 38, ¶¶ 25, 26; Dkt. 39, ¶¶ 8, 9; Dkt. 41, ¶¶ 11, 12; Dkt. 26 (Richards Dep. 42:25-43:1); Dkt. 24 (Kemmis Dep. 151:16-18).

The court concludes that under common law principles of agency, plaintiffs made their contributions to the course materials as Academy employees. Thus the course materials, including specifically the 2013 Materials, are works made for hire under the Copyright Act. The Academy is the owner and legal author of these materials, and it is entitled to judgment as a matter of law on plaintiffs' copyright claims.

### 2.  The Academy's alternative theories

The Academy offers other theories to defeat plaintiffs' copyright infringement claims. The Academy contends that the 2013 Materials are joint works to which others besides plaintiffs contributed authorship, and that the other authors have assigned their rights to the Academy. Thus, the Academy stands in the shoes of the non-plaintiff joint authors, and it cannot be liable for infringement of copyrights to which it holds rights as a joint author. The Academy also contends that, pursuant to the parties' contracts, the Academy is the owner of the course materials. Both alternative theories are plausible and have evidentiary support, but the court need not address them in light of the court's dispositive answer on the work-for-hire question.

The court will, however, draw one last conclusion from the evidence presented at summary judgment: plaintiffs have, at a minimum, granted the Academy an implied non-exclusive license to use the course materials in connection with the CEEAA program. Although an implied non-exclusive license would not transfer ownership of the copyright to

26

the Academy, it would defeat plaintiffs' charges of copyright infringement. *HyperQuest, Inc. v. N'Site Sols., Inc.*, 632 F.3d 377, 382 (7th Cir. 2011); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996).

An implied nonexclusive license arises when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Shaver*, 74 F.3d at 776 (citing *Effects Assocs. v. Cohen*, 908 F.2d 555, 557-58 (9th Cir. 1990)); *Muhammad-Ali*, 832 F.3d at 762. It "may be granted orally, or may even be implied from conduct." *Shaver*, 74 F.3d at 775 (citations omitted).

There is no genuine dispute as to any of these three elements here. The Academy asked plaintiffs to contribute to the course materials, they did so and provided the materials at CEEAA courses, and plaintiffs intended that the Academy would use the course materials and distribute them to CEEAA program participants.

Although the Academy could violate plaintiffs' copyright by exceeding the scope of the license, *id.*, that is not the case here. The scope of the implied license was limited to the CEEAA program, but it allowed subsequent revisions and refinements to the course materials. The parties always recognized the ongoing refinement to reflect developments in the field as an inherent part of the process.

The Academy did not argue the implied license issue (perhaps for understandable strategic reasons), but the facts supporting this defense are clearly established and thus the court includes it as an alternative ground for its grant of summary judgment on plaintiffs' copyright claim.

**C.      The Academy's counterclaims**

Plaintiffs also move for summary judgment on the Academy's counterclaims. Dkt. 30. Plaintiffs present no argument on the breach of contract question, so the court will summarily deny plaintiffs' motion as to the Academy's counterclaim for breach of contract. *Lust v. Sealy, Inc.*, 243 F. Supp. 2d 908, 919 (W.D. Wis. 2002) ("Arguments not developed in any meaningful way are waived." (quoting *Cent. States, Sw. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999)).

That leaves the Academy's breach of fiduciary duty claim against plaintiff Parker. Plaintiffs contend in a scant three-paragraph section of their brief that, although Parker was a director for the Academy, she was not present at any meeting where the board discussed the ownership of the 2013 Materials. They also contend that she "made it a point to never discuss the issue" of the copyright with other board members and that she resigned from the board nearly nine months before this lawsuit was filed. Dkt. 37, at 18-19. The Academy, on the other hand, has presented evidence that raises a genuine dispute of fact. Parker was aware of the parties' dispute over the 2013 Materials when she registered the 2013 Materials. She discussed with her attorney about the copyright issues in the 2013 Materials for months before she filed for registration. She was also present at board meetings when the board revised the administrator contract and filled the administrator positions in response to the copyright dispute involving the 2013 Materials. Therefore, plaintiffs' factual assertions are genuinely disputed.

Plaintiffs also raise new arguments in their reply brief, namely that the Academy should not be allowed to base a breach of fiduciary duty claim on Parker's copyright registration and that the Academy points to no evidence of damages. But the court will not

consider arguments first raised in a reply brief. *See United States v. King-Vassel*, 728 F.3d 707, 716 (7th Cir. 2013) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Framsted v. Mun. Ambulance Serv., Inc.*, 347 F. Supp. 2d 638, 653 (W.D. Wis. 2004) ("Arguments raised for the first time in a reply brief are deemed waived." (citing *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998))).

Accordingly, the court will deny plaintiffs' motion for summary judgment as to the Academy's breach of fiduciary claim against Parker.

CONCLUSION

The court denies plaintiffs' motion for summary judgment. The court grants the Academy's motion for summary judgment, and plaintiffs' copyright infringement claims are dismissed. The Academy's counterclaims remain for trial.

ORDER

IT IS ORDERED that:

1. Defendant Academy of Geriatric Physical Therapy's motion for summary judgment, Dkt. 29, is GRANTED.

2. Plaintiffs Marilyn Moffat, Karen Kemmis, Danielle Parker, and Mark Richards's motion for summary judgment, Dkt. 30, is DENIED.

3. Plaintiffs' copyright infringement claims are dismissed.

Entered December 22, 2016.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge